Application of Walter M. BUDDE, Jr.

Patent Appeal No. 6959.

United States Court of Customs and Patent Appeals.

June 20, 1963.

Philip E. Siggers, Washington, D. C., and Alton V. Oberholtzer, Minneapolis, Minn., for appellant.

Clarence W. Moore, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

WORLEY, Chief Judge.

This appeal is from the decision of the Board of Appeals which affirmed the rejection of claims 19–30 of appellant's application [1] entitled "Method of Producing Epoxy Fatty Acids, Epoxy Salt Derivatives and Epoxy Alcohols" as unpatentable over the prior art.

In his brief appellant has withdrawn claims 23, 24 and 26–28, leaving only claims 19–22, 25, 29 and 30 for our consideration. No claims have been allowed.

Claim 19 is representative and reads:

"19. In the method of producing an epoxy fatty salt from a saponifiable epoxidized long chain fatty ester under elevated temperature conditions, the steps comprising mixing

---

1. Serial No. 624,747, filed November 28, 1956.

a said epoxy fatty ester material having a fatty radical of 10 through 22 carbon atoms and an oxirane group in said fatty radical with a solvent solution of a saponifying alkali metal hydroxide, heating the mixture to a reaction temperature of from about 50°C to about 120°C for a period of from about 20 minutes to not over about 2 hours, and effecting the production of an epoxy fatty salt during the said reaction period."

The process relates to the production of certain epoxy fatty acids, salts and alcohols from their respective epoxy fatty esters. Appellant's specification states:

"In general, the resultant ultimate products derived in the preferred manner from epoxy fatty esters can be illustrated by the following

$$
\overset{\overset{\textstyle O}{\|}}{R_1 - C - OR_2} \xrightarrow[\nabla \text{ Soluble Alcohol}]{\text{NaOH, (KOH or LiOH)}} \overset{\overset{\textstyle O}{\|}}{R_1 - C - ONa} + R_2OH
$$

$$\downarrow \text{ Acidulated}$$

$$R_1COOH$$

if $R_1$ is an epoxy fatty acid radical with 10–22 carbon atoms, then the residue is the metal salt of an epoxy fatty acid and the by-product $R_2OH$ can be mono or polyhydric so as to be either volatile or readily water soluble for extraction. For monohydric $R_2OH$, $R_2$ can be methyl through octyl and for polyhydric $R_2OH$, $R_2$ can be glycol or glycerides. If $R_1$ is a fatty acid radical which forms a water soluble by-product and $R_2$ is an epoxidized fatty alcohol radical, with at least 10 carbon atoms, then the desired product is an epoxy fatty alcohol."

The specification goes on to state that the most favorable method of preparing the epoxy fatty acids is by epoxidizing an unsaturated ester with a mixture of sulfuric acid, acetic acid and hydrogen peroxide to give the corresponding epoxy fatty ester, the starting material in the claims. The epoxidized ester is then saponified with sodium hydroxide in methanol to give the corresponding sodium salt. The epoxy salt may then be acidulated with hydrochloric acid to epoxidized fatty acid.

The resultant products are said to be useful as intermediates in the preparation of polyesters, as cleaning agents, insecticides, stabilizers, grease constituents and metal ion precipitating agents.

The *only* references relied on and discussed by the examiner and the board are:

Boeseken et al., Chemical Abstracts, Vol. 23, p. 4192 (1923)

Pigulevskii et al. (I) Chemical Abstracts, Vol. 26, p. 2170 (1932) Abstract of J. Gen. Chemistry, Vol. 1, No. 2, pp. 235–239 (1931)

Pigulevskii et al. (II), Chemical Abstracts, Vol. 50, p. 10,073 (1956) (Abstracts of J. Applied Chemistry (USSR) Vol. 28, pp. 1353–5)

Boeseken et al. discloses the oxidation (epoxidation) of methyl 9, 12-linoleate by perbenzoic acid or peracetic acid to methyl dioxidostearate (di-epoxy methylstearate). Saponification of the latter at "low temperature" yields dioxidostearic acid (di-epoxy stearic acid).

Pigulevskii et al. (I) teach the preparation of dioxido lineoleate (di-epoxy linoleate) by oxidation of methyl linoleate with perbenzoic acid in diethyl ether. The reaction mixture is allowed to stand four days in the cold and is then refluxed two hours. The di-epoxy linoleate is then shown to be saponified with alcoholic potassium hydroxide. After the alcohol is expelled the residue is decomposed with sulfuric acid and the free acid, viz., dihydroxy linoleic acid is recovered.

Pigulevskii et al. (II) discloses that peach oil is saponified by normal alcoholic potassium hydroxide; the mixed fatty acids esterified with methyl alcoholic 5% HCl to the methyl ester; and the latter oxidized with peracetic acid to methyl oleate oxide (epoxy methyl oleate). Saponification of methyl oleate oxide for 24 hours with 0.5 normal alcoholic potassium hydroxide at room temperature, followed by acidification gives oleic acid oxide (epoxy oleic acid). Methyl linoleate dioxide (di-epoxy methyl linoleate) may be reacted in a similar manner to give linoleic acid dioxide (di-epoxy linoleic acid).

The board affirmed the examiner's rejection of all claims as "unpatentable over the Boeseken et al. publication and the Pigulevskii publications." In so holding it stated:

" * * * the claimed process, which involves a saponification of an epoxy fatty acid ester with an alcoholic alkali metal hydroxide and acidification to produce the epoxy fatty acid, would be apparent from the disclosure of any of these references. Appellant's claims call for particular broad ranges of temperature and time but do not specify the concentration of the alkali hydroxide in the alcohol solvent employed. * * * The experiments required to determine optimum concentrations, times and temperatures are not of a complex nature and this determination is well within the skill of the art. The relative amount of alkali called for is that necessary to ensure a slight excess in order to carry the reaction to completion. The reflux conditions called for in claim 21 accomplish, as far as the specification shows, only those results which would be expected from this conventional procedure; * * *. No particular advantage is shown to result in the use of acetic acid or a lower carboxylic acid instead of a dilute sulfuric acid solution as in the Pigulevskii *et al.* publication."

According to claim 19, which is representative, the essential steps of producing an epoxy fatty salt from an epoxy fatty ester comprise:

"(1) Mixing

"(a) An epoxy fatty ester having 10–22 carbon atoms and an oxirane group is the fatty radical, with

"(b) A solvent solution of alkali metal hydroxide, and

"(2) Heating the mixture

"(a) To a reaction temperature of about 50°–120°C

"(b) For a period of about 20 minutes to 2 hours."

Claim 20 adds to claim 19 the step of acidifying the salt with aqueous acetic acid to produce an epoxy fatty acid. Claim 21 limits claim 19 to refluxing "an optimum of 45 minutes." Claim 22 differs from claim 19 in specifying molar proportions of the epoxy-fatty ester and alkali metal hydroxide. Claim 25 requires that an excess of metal hydroxide be used, and also contains the limitation that the epoxy fatty salt have a "substantial retention of the original starting oxirane value."

Claim 29 is drawn to the method of preparing an epoxy fatty alcohol from an epoxidized fatty ester whose alcohol radical contains 10–22 carbon atoms and at least one oxirane group. The recited reaction steps are substantially the same as the steps of claim 19.

Claim 30 is drawn to a method of reacting an epoxy fatty ester with an alkali metal hydroxide with substantially the same limitations as claim 19.

Comparison of the prior art with claim 19 makes it readily apparent that, except for the recited ranges of temperature and reaction time, the essential elements of the claimed saponification reaction are taught by the prior art. The specific question, therefore, is whether the determination of those reaction conditions would be obvious to one of ordinary skill in the art.

It is the position of the examiner and the board that, since the saponification of epoxy fatty esters with alcoholic metal hydroxides to salts, as well as acidification of the resultant salts to the free acid form, are taught by the references, all that appellant has done is to determine an optimum range of reaction conditions which lies within the ability of a chemist of ordinary skill.

It is appellant's position that the claims are patentable over each of the references because the "elevated temperature, the brief time of reaction, and the yield of a salt with little or no oxirane loss serve to distinguish" the claims from the references.

In considering the factors which appellant relies on for patentability, the examiner stated:

" * * * It is the position of the Examiner that the application of specific conditions to type reactions disclosed by the references is within the scope of the skilled chemist and does not arise to the dignity of invention. The art recognized that the saponification will yield epoxy products without destroying the oxirane ring. It is only with drastic hydrolysis that the hydroxy acids are formed, since with weak acids, the oxides (epoxides) of the acids are formed. If the reaction time is to be shortened, the use of more concentrated reactants would certainly be an expedient the skilled chemist would try. * * * In the instant case, the art recognizes that the process will yield epoxy fatty acids and thus the instant claims do not define thereover merely because of the specifically recited conditions which yield the same products. * * * "

We agree with the examiner and the board that the invention defined by the claims would be obvious to one of ordinary skill in the art. Only the saponification reaction is claimed herein. Although appellant calls our attention to the long reaction times referred to in the Pigulevskii references, these times are concerned with *epoxidation* of the fatty acid esters *prior* to saponification, that is, with preparation of appellant's claimed starting materials. Since appellant's claims are directed to saponification rather than epoxidation, that argument is not material.

The only pertinent disclosures of reaction conditions in the references are the statement of Pigulevskii et al. (II) that saponification was carried out at room temperature, for 24 hours, using 0.5 normal alcoholic potassium hydroxide, and the statement of Boeseken et al. that saponification was carried out at "low temperature." It seems to us that only routine experimentation was involved in determining optimum or economically feasible reaction conditions. It would not be unexpected to find an increase in reaction temperature to result in a shorter reaction time. Appellant agrees with the statement made by the solicitor in his brief that it is common knowledge that "a reaction may be speeded up by raising the temperature."

Appellant contends also that it is unexpected that no loss of oxirane groups occurs as a result of his use of more drastic reaction conditions than the prior art.

The examiner noted that "The art recognized that the saponification will yield epoxy products without destroying the oxirane ring," and that "It is only with drastic hydrolysis [conditions] that the hydroxy acids are formed, since with weak acids, the oxides (epoxides) of the acids are formed." That evaluation of the prior art appears correct. Clearly, none of the references discloses that the oxide (epoxide or oxirane) groups are broken by the saponification reaction. Pigulevskii et al. (II) specifically state that oleic acid oxide and linoleic acid dioxide were isolated. In the absence of any limitations on that disclosure it constitutes a clear teaching that the oxides or epoxides were in fact left unaltered by the saponification reaction. Furthermore, as noted by the examiner, hydrolysis of the oxide groups, shown by both Boeseken et al. and Pigulevskii et al. (I),

requires "drastic" conditions such as the use of hot or concentrated sulfuric acid. Consequently, we are of the opinion that one skilled in the art would have no reason to presume, as appellant contends, that saponification of an epoxy fatty ester to the corresponding epoxy salt or epoxy alcohol, as taught by the art of record, would result in breakage of the oxirane ring.

■■ The recited ranges of reaction time and temperature have not been shown to be critical, or to produce any unexpected results. Only a difference in degree rather than in kind appears to have been produced. The recited reaction conditions constitute merely modifications of an old process which, we think, one skilled in the art would be capable of making, hence they do not patentably distinguish over the prior art. In re Aller, 220 F.2d 454, 42 CCPA 824.

We have considered all the additional limitations recited in the remainder of the claims, including those referred to specifically above, but find them without patentable significance.

Finding none of the errors alleged by appellant, the decision is affirmed.

Affirmed.

SMITH, Judge (dissenting).

The majority has concluded that the "Method of Producing Epoxy Fatty Acids, Epoxy Salt Derivatives and Epoxy Alcohols" claimed in appellant's appealed claims is obvious to one of ordinary skill in this art and hence unpatentable under 35 U.S.C. § 103.

35 U.S.C. § 103 requires us to determine whether or not the *differences* between the prior art and the *claimed invention as a whole* would have been obvious *at the time the invention was made* to a person of ordinary skill in the art.

The invention disclosed by appellant relates to what is said to be a feasible commercial process for making (1) epoxy fatty acids, (2) epoxy fatty acid salts, and (3) epoxy fatty alcohols, *without* detrimental splitting of the oxirane ring. A significant feature of this process is that the time required for carrying out the process is sharply reduced.

The products produced by the process are useful as chemical intermediates in a wide variety of applications such as in polyester preparations, cleansing agents, insecticides and their preparation. The products also are used as stabilizers, textile aids, constituents of certain greases, metal ion precipitating agents, and in the preparation of ammonium soaps and nitrile and amine products. Epoxy fatty alcohols made by the described process also may serve as plasticizers. It is important, according to appellant, to control the amount of splitting of the oxirane rings for while a small amount of splitting of the oxirane rings may be tolerated, if a substantial amount of splitting of the oxirane rings occurs, the resulting product or mixture is not useful for the intended purpose.

A survey of the commercial uses for the product discloses many areas in which the desideratum is a product which can be made available in substantial quantities and at commercially realistic prices. In any chemical process time is an important factor which enters into the cost of the product. Thus, to save time in a process is one way to increase the efficiency of a given chemical process which in turn leads to increased production and lower costs.

Appellant has stated in his specification:

"Accordingly, it is an object of this disclosure to provide an improved commercially feasible method of producing epoxy salts, epoxy fatty acids and epoxy fatty alcohols from epoxy esters of aliphatic, unsaturated, unconjugated fatty acids and fatty alcohols.

"Another object of this disclosure is to provide an improved commercially feasible method of producing epoxy fatty acids from epoxy derivatives of seed oils in a commercially feasible manner.

"An additional object of this disclosure is to provide an improved

method of economically producing epoxy salts from epoxy esters of fatty acids on a commercially feasible basis by forming from epoxy fatty esters the epoxy salts thereof in a manner which would normally be expected to detrimentally break the oxirane."

It is to be noted from these statements and from the record as a whole that the problem posed by the prior art at the time the present invention was made was how to reduce the reaction times without excessive splitting of the oxirane ring.

While I agree with the general proposition that many chemical reactions are speeded up as the temperatures of reaction are increased (and that to this extent appellant's use of higher reaction temperatures than those of the prior art may be said to be obvious), I am unable to so categorize the process "as a whole." A British patent, No. 854,670, incorporated in the record before this court, indicates that the use of high temperatures would result in a loss of oxirane rings by reason of their splitting. Such splitting in turn results in the formation of undesirable side products. Thus, it seems to me that appellant's invention "as a whole" clearly differs from the prior art teachings in an unobvious manner.

It is interesting here that the prior art upon which the Patent Office relies are abstracts reporting laboratory experiments which, over a period of some 25 years, still had apparently not resulted in the production of anything but a scientific curiosity. As stated by the majority, "The only pertinent disclosures of reaction conditions in the references are the statement of Pigulevskii et al. (II) that saponification was carried out at room temperature, for 24 hours, using 0.5 normal alcoholic potassium hydroxide, and the statement of Boeseken et al. that saponification was carried out at 'low temperature.'" The date of Pigulevskii et al. (I) is 1931; the date of Pigulevskii et al. (I) is 1931; the date of Pigulevskii

et al. (II) is 1955. The date of the Boeseken et al. abstract is 1929.

While I agree with the majority opinion that the prior art does not discuss the breaking of the oxirane ring under the reaction conditions there specified, it is appellant's position, as shown by the British patent and which has not been factually rebutted by the examiner, that oxirane values are lost by excessive splitting of the oxirane rings and that such splitting would be the expected result of increasing the reaction temperatures to reduce the time of the process.

I think, therefore, that the present case is one to which we should apply our comments in In re Sporck, 301 F.2d 686, 49 CCPA 1039, that:

"Obviousness is a legal conclusion which we are required to draw from facts appearing in the record or of which judicial notice may be taken. * * * Here, neither the record nor the facts of which we are able to take judicial notice supplies the factual data necessary to support the legal conclusion of obviousness of the invention at the time it was made. We are unwilling to substitute speculation and hindsight appraisal of the prior art for such factual data. For this reason we think there is a doubt as to the factual basis supporting the conclusion of the board of appeals that the invention would have been obvious to one of ordinary skill in the art of metal spinning. Under these circumstances, the doubt should be resolved in favor of the applicant. (Citing two cases)."

If, therefore, we consider appellant's "invention as a whole," we see that it is more than a mere routine juggling of reaction conditions to achieve optimum results. As such, I think the *differences* between the prior art and the invention claimed in the appealed claims would not have been obvious to one of ordinary skill in this art. I would therefore reverse the board's decision.